2024 IL App (1st) 211658-U

No. 1-21-1658

Order filed March 29, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 2373 |
| | ) | |
| TOREY MINNION, | ) | Honorable |
| | ) | Patrick K. Coughlin, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Reversing the trial court's denial of leave to withdraw defendant's plea, where plea counsel performed deficiently in misadvising him that he would be immediately released, and failing to inform him that his plea could subject him to indefinite civil commitment under the Sexually Violent Persons Act. The record supported defendant's claim that he would not have pleaded guilty if not for counsel's deficiency, and that a decision to reject the plea bargain would have been rational under the circumstances.

¶ 2    Defendant Torey Minnion pled guilty to aggravated criminal sexual abuse and was sentenced to 66 months' imprisonment. He appeals the trial court's order denying his motion to

withdraw his guilty plea. Defendant argues that his plea was involuntary because plea counsel failed to inform him that he could be involuntarily committed under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2018)).

¶ 3    The State charged that between July 24, 2015, and December 28, 2015, defendant committed the following offenses: two counts of predatory criminal sexual assault of a child (PCSA) premised on separate acts of contact between defendant's penis and the minor victim D.J.'s mouth  (720 ILCS 5/11-1.40(a)(1) (West 2014)) (counts I and II); three counts of aggravated kidnapping premised on defendant secretly confining D.J. against her will and without permission of her parent or guardian (count III), committing an act of PCSA upon her (count IV), and committing an act of aggravated criminal sexual abuse (ACSA) upon her (count V) (720 ILCS 5/10-2(a)(2), (3) (West Supp. 2015)); and two counts of ACSA premised on separate acts of defendant transmitting semen onto D.J.'s face for the purpose of sexual arousal or gratification (720 ILCS 5/11-1.60(c)(1)(i) (West Supp. 2015)) (counts VI and VII).

¶ 4    At a hearing on August 14, 2018, the parties announced they had reached an agreement wherein defendant would plead guilty to ACSA (count VI) in exchange for a six-year sentence. After a discussion regarding whether defendant's sentence was extendable, the State noted that he "would be evaluated prior to release from the Illinois Department of Corrections." Defendant's counsel then stated that the defense was rejecting the agreement. The court continued the case, and the State noted it would keep the offer open.

¶ 5    On the next date, October 1, 2018, the parties explained they had come to an agreement wherein defendant would plead guilty to ACSA (count VI) in exchange for 66 months' imprisonment. The State noted that defendant would have to register as a sex offender for life and

"[t]here would also be [Illinois Department of Corrections] screening for sexually violent persons prior to his release." The defense asked the court to pass the case for a moment. Once the parties returned, the defense asked the court to hold the matter over until October 4, 2018.

¶ 6    On October 4, 2018, plea counsel stated that defendant agreed to the offer and had credit for 1004 days' presentence custody. The State again noted the conviction would require lifetime sex-offender registration and "a screening by the Illinois Department of Corrections for applicability for civil action under the Sexually Violent Persons Act[.]" The court confirmed with defendant that he understood the charge and wished to waive his trial rights and plead guilty. Defendant also confirmed that he had not been threatened or promised anything in exchange for his plea and was pleading guilty of his own free will. Defendant understood that pleading guilty could result in increased or consecutive sentences for future convictions, restrictions on where he could work, live, or be present, and his ability to retain or obtain employment, firearms, housing, or licenses. Defendant also understood that the court could sentence him to three to seven years in prison on the charge, followed by two years' mandatory supervised release (MSR).

¶ 7    The State set forth the factual basis for the plea, explaining that the evidence at trial would show that on December 28, 2015, defendant, who was over 17 years old, escorted D.J., his girlfriend's 8-year-old daughter, into the bathroom and closed the door. There, he had her sit on the toilet seat and close her eyes. He lowered his pants, ejaculated, and "placed semen" on her face for sexual gratification. Defendant's counsel stipulated that would be the trial testimony. The court found that defendant understood the charges and possible penalties and accepted his plea as free and voluntary. The State nol-prossed the remaining counts.

¶ 8    The cause proceeded directly to sentencing. The State noted in aggravation that defendant had a 2002 finding of delinquency for ACSA, and convictions in 2010 and 2013 for "failure to register," for which he received two-year prison sentences. The court accepted the parties' agreement and sentenced defendant to 66 months' imprisonment followed by 2 years' MSR. The court awarded him credit for 1004 days' time served in presentence custody. The court noted that defendant would be required to register as a sex offender for his lifetime and would "be screened for the Sexually Violent Persons Act." The court informed defendant that if he wished to appeal he had to file a written motion to withdraw his plea.

¶ 9    On October 29, 2018, defendant filed a *pro se* motion requesting a "retrial" because he received ineffective assistance of counsel. He asserted that plea counsel had told him that, if he accepted the State's plea offer, he would go home the next day. However, he was still "in jail." Defendant indicated he would have rejected the plea offer had he not thought he would go home.

¶ 10   The court called the case several times. It noted that defendant had filed a motion to withdraw his plea but had been released from the Illinois Department of Corrections (IDOC). On March 22, 2019, the State informed the court that defendant was being held by the Department of Human Services (DHS) pursuant to the Act.

¶ 11   Defendant was appointed postplea counsel. In June 2021, postplea counsel filed a supplemental motion to withdraw defendant's guilty plea. Postplea counsel argued that plea counsel was ineffective as she promised defendant that the plea offer would result in his release from custody the following day, but he remained in custody. Plea counsel did not explain the Act to defendant or discuss its potential ramifications.

¶ 12    On December 20, 2021, the court held a hearing on defendant's motion. The court set out the procedural history of the case, noting that when defendant pled guilty he "basically *** had turn around time" of presentence custody and was released to DHS on November 1, 2018. The court further stated that if defendant's motion was granted and his plea withdrawn, all the counts would be reinstated. If he was found guilty as charged, sentences for the PCSA counts would run consecutive to each other and to a sentence for aggravated kidnapping, making the minimum sentence 18 years' imprisonment. Defendant would have to serve 85% of the minimum sentence, approximately 15 years and 3½ months' imprisonment. Given defendant's presentence custody credit, he would have to serve approximately 12½ more years in prison. After serving that sentence, he could potentially be remanded to DHS again. Defendant's counsel and the State agreed that the court's statement was accurate.

¶ 13    Defendant called his sister Nina Minnion to testify.[1] Nina testified that she was present in court on October 4, 2018, when defendant pled guilty. That day, plea counsel had explained to Nina that if defendant took the plea offer, he would receive time served and be "dressed in and dressed out," meaning he would return to jail, change into regular clothes, and be released to Nina's home on home monitoring. Plea counsel did not mention any possibility that defendant would not be released or could be committed.

¶ 14    During defendant's testimony, he averred that his guilty plea was based on the understanding that he would be released to his sister on electronic monitoring.  Defendant stated that on October 1, 2018, plea counsel approached him with the final plea offer and told him that he "would be dressing in and dressing out for time considered served." Defendant did not know

---

[1] As defendant and his sister share a surname, we refer to his sister by her first name.

he would have to "register for life," which is why plea counsel requested a short continuance. On October 4, 2018, she again told him he would have time considered served and, therefore, "dress in and dress out." Defendant believed that, if he pled guilty, he would return to jail and, the next day, return to IDOC, change, be processed out, and released to Nina on electronic monitoring. Plea counsel never mentioned the Act or explained that he could be held in custody after completing his sentence.

¶ 15    Defendant testified that, after pleading guilty, he was taken to prison. There he was processed in and placed in a bullpen, then processed back out and placed in another bullpen to be returned to the county jail for processing out. However, defendant was pulled out of that bullpen and placed back with other inmates, without explanation. He remained there for approximately two weeks, then learned that he could not be released to Nina's home as it was too near a daycare center. Defendant arranged for his uncle to pick him up, but he was never released or told if his uncle's residence had been approved. He remained in prison until November 1, 2018, when he was transferred "to Cook County" and placed into custody. If he had known that he would not be "dressed in and dressed out" or receive time served, he would have rejected the plea offer and gone to trial.

¶ 16    On cross-examination, defendant testified that plea counsel informed him that the minimum sentence after trial would be 18 years' imprisonment. He did not recall the judge admonishing him that he was subject to screening for civil action under "the Sexually Violent Persons Act." On redirect examination he testified that the plea agreement was for time considered served in 2018, and that he had not been released at any point in the subsequent three years.

¶ 17    Postplea counsel entered into evidence the transcript from defendant's plea hearing and a petition from the Attorney General's office to have him committed under the Act. The petition is included in the record on appeal, although the filing date is not legible due to the poor-quality copy. In the petition, the Attorney General indicates that defendant suffers from "Pedophilic Disorder, sexually attracted to both, non-exclusive type, and Antisocial Personality Disorder." The petition asserts that defendant's conditions affect his emotional or volitional capacity and predispose him to committing sexual violence, and he is dangerous as his disorders make it "substantially probable" that he will commit sexual violence. The petition notes that an evaluation report was attached and incorporated, but the report is not included in the record on appeal.

¶ 18    Following argument, the court denied defendant's motion. The court found that defendant had been informed on several occasions that he would have to be evaluated prior to his release. The court further found that defendant had not articulated any prejudice from counsel's actions beyond merely asserting that he would not have pled guilty had he known of the possibility for civil commitment. The court noted that, had defendant been found guilty after trial, he risked lengthy imprisonment, after which "he would find himself right back to where he is now facing civil commitment under the Sexually Violent Persons Act." Thus, the court concluded that defendant had not shown it would have been rational for him to reject the plea bargain and, therefore, failed to show he suffered prejudice from counsel's erroneous advice.

¶ 19    On appeal, defendant argues that the circuit court erred in denying his motion to withdraw his guilty plea as his plea was caused by ineffective assistance of plea counsel and therefore involuntary. Defendant contends that plea counsel performed deficiently by failing to inform him that, if he pled guilty, he could be subject to indefinite civil commitment under the Act. Instead,

counsel told him that, if he pled guilty, he would be released the following day. Defendant asserts that he was prejudiced as he believed he would be immediately released and would have rejected the plea offer had he known he could be committed under the Act.

¶ 20    "A defendant has no absolute right to withdraw his guilty plea." *People v. Hughes*, 2012 IL 112817, ¶ 32. "Rather, he must show a manifest injustice under the facts involved." *Id.* A defendant may withdraw his plea where he entered it through a misapprehension of the facts or the law or there is doubt as to his guilt and justice would be better served through a trial. *Id.* We review the trial court's decision to deny leave to withdraw a guilty plea for an abuse of discretion, *i.e.*, we must determine whether the court's decision was arbitrary, fanciful, or unreasonable. *Id.*; *People v. Delvillar*, 235 Ill. 2d 507, 519-20 (2009).

¶ 21    A guilty plea must be knowing and voluntary. *Hughes*, 2012 IL 112817, ¶ 35. A plea is not voluntary if it resulted from ineffective assistance of plea counsel. *Id.* ¶ 33. A defendant has the right to effective assistance of counsel at all critical stages of criminal proceedings, including at the entry of a guilty plea. *Id.* ¶ 44.

¶ 22    A challenge to a guilty plea based on ineffective assistance of counsel is subject to the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Rissley*, 206 Ill. 2d 403, 457 (2003). Thus, to establish ineffective assistance of counsel, defendant must show that his counsel's performance was deficient and that he was prejudiced by the deficient performance. *Hughes*, 2012 IL 112817, ¶ 44 (citing *Strickland*, 466 U.S. at 687). In the context of plea proceedings, counsel performs deficiently if she fails to ensure the defendant's plea was voluntary and knowing. *Rissley*, 206 Ill. 2d at 457. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's errors, [the defendant] would not

have pleaded guilty and would have insisted on going to trial." (Internal quotation marks omitted.) *Hughes*, 2012 IL 112817, ¶ 63.

¶ 23    When, as here, a defendant claims his counsel's ineffectiveness affected his understanding of the consequences of pleading guilty, establishing prejudice does not require showing that he had a viable defense or would have been acquitted following trial. *People v. Brown*, 2017 IL 121681, ¶¶ 34-35 (citing *Lee v. United States*, 582 U.S. 357, 365-66 (2017)). However, we will not upset a plea based solely on a defendant's bare allegation that he would not have pled guilty but for his attorney's deficiency. *Hughes*, 2012 IL 112817, ¶ 64.

¶ 24    Rather, comparing the consequences of a conviction following trial to the consequences of entering the plea, the defendant must establish that a decision to reject the plea bargain and opt for trial would have been rational under the circumstances. *Brown*, 2017 IL 121681, ¶¶ 35-36, 48. It may be rational to take " 'even the smallest chance of success at trial' " when, from the defendant's perspective, the consequences are " 'similarly dire' " to pleading guilty, such as where the prosecution's offer is just below the maximum sentence following trial. *Id.* ¶ 36 (quoting *Lee*, 582 U.S. at 367). Whether a defendant has shown the requisite prejudice turns on the facts of the particular case. *Hughes*, 2012 IL 112817, ¶ 65.

¶ 25    Defendant argues plea counsel provided ineffective assistance by failing to advise him about the applicability and potential consequences of the Act. The Act provides for nonpenal, civil commitment for the long-term control, care and treatment of sexually violent persons. *Id.* ¶ 37 (citing 725 ILCS 207/20, 40(a) (West 2018)). A sexually violent person includes a person who has been convicted of a sexually violent offense and is dangerous because he "suffers from a mental disorder that makes it substantially probable that [he] will engage in acts of sexual violence." 725

ILCS 207/5(f) (West 2018). Shortly before a person convicted of committing a sexually violent offense will be released from custody, his mental condition will be evaluated to determine whether he is subject to commitment under the Act. *Hughes*, 2012 IL 112817, ¶ 38 (citing 725 ILCS 207/10(b)(1), (c)(2) (West 2018)). The Attorney General or relevant State's Attorney may then file a petition alleging that the person is a sexually violent person. *Id.* ¶ 39 (citing 725 ILCS 207/15(a) (West 2018)).

¶ 26    If such a petition is filed, the circuit court holds a hearing to determine whether there is probable cause to believe the defendant is a sexually violent person. *Id.* (citing 725 ILCS 207/30(b) (West 2018)). If there is, the court holds a trial where the petitioner must prove beyond a reasonable doubt that the person is a sexually violent person. *Id.* (citing 725 ILCS 207/35(d)(1) (West 2018)). If the petitioner meets that burden, the person is committed to DHS custody for "control, care and treatment," until they are no longer a sexually violent person. 725 ILCS 207/40(a) (West 2018). The person may appeal the court's ruling. See, *e.g.*, *In re Commitment of Gavin*, 2014 IL App (1st) 122918 (appeal from jury's finding that defendant was a sexually violent person).

¶ 27    When a person is committed under the Act, at least once every 12 months DHS must submit a written report on his mental condition to the court to determine whether he has progressed in treatment such that he may be conditionally released, and whether his condition has so changed that he is no longer a sexually violent person. 725 ILCS 207/55(a) (West 2018). Also every 12 months, the person may petition the court for his conditional discharge. 725 ILCS 207/60(a) (West 2018). The director of the facility where the person is placed may also petition for his conditional release at any time. *Id.* The person may also petition for his discharge at the time of the yearly examination. 725 ILCS 207/65(b)(1) (West 2018). Further, if at any time the DHS secretary

determines the person is no longer a sexually violent person, they must authorize the person to petition the court for discharge. 725 ILCS 207/65(a)(1) (West 2018).

¶ 28 Given the above procedures, civil commitment under the Act is not certain to occur following a conviction for a sexually violent offense. *Hughes*, 2012 IL 112817, ¶¶ 37, 40. Commitment under the Act is therefore a collateral consequence of pleading guilty to a sexually violent offense rather than a direct consequence. *Id.* ¶¶ 36, 40. Nevertheless, becoming subject to the risk of commitment under the Act is severe and enmeshed in the criminal process. *Id.* ¶¶ 49-51. The sixth amendment right to effective assistance therefore obligates plea counsel to advise a defendant that pleading guilty to a triggering offense under the Act will result in his being evaluated under the Act and potentially committed after completing his prison term. *Id.* ¶ 60. However, even where counsel fails to advise a defendant about the Act, the defendant must still establish prejudice, *i.e.*, that there is a reasonable probability that but for counsel's errors the defendant would not have pleaded guilty. *Id.* ¶ 63.

¶ 29 Here, defendant asserts, and the State does not dispute, that plea counsel performed deficiently by failing to advise him he could be committed under the Act for pleading guilty to ACSA (720 ILCS 5/11-1.60(c)(1)(i) (West Supp. 2015)), which the Act defines as a sexually violent offense (725 ILCS 207/5(e)(1) (West 2018)). We agree that counsel was deficient for failing to inform defendant that if he pled guilty to aggravated criminal sexual abuse, he would be evaluated for and might risk involuntary commitment after completing his prison term. See *Hughes*, 2012 IL 112817, ¶ 60.

¶ 30 The State, however, asserts that any failure by counsel to advise defendant of the Act's procedures, was cured by the court itself advising defendant on the record. The State notes that,

several times, the court or State indicated in open court that, if defendant pled, he would be subject to screening under the Act, and at least once adding that the screening was "for applicability for civil action under the Sexually Violent Persons act." See *People v. Valdez*, 2016 IL 119860, ¶¶ 29-32 (admonishments from court can cure prejudice from incorrect advice by counsel). However, as defendant points out, the word "commitment" was never uttered in court in relation to the Act. Although defendant was informed that he was subject to screening under the Act, defendant was not informed that the screening could result in involuntary civil commitment after he served his criminal sentence. Accordingly, counsel's deficiency was not cured by the court's admonishments.

¶ 31　The State next asserts that defendant is not prejudiced by counsel's deficiency, as he has made only a bare allegation that he would not have pled guilty if counsel had properly advised him, which is insufficient to establish prejudice. See *Hughes*, 2012 IL 112817, ¶¶ 63-64 (defendant claiming counsel was ineffective for failing to advise him of potential commitment under the Act must still establish he was prejudiced); see also *Lee*, 582 U.S. at 358 ("Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Rather, they should look to contemporaneous evidence to substantiate a defendant's expressed preferences.").

¶ 32　In *Hughes,* 2012 IL 112817, our supreme court considered a similar situation in which the defendant, who pleaded guilty to aggravated criminal sexual abuse, filed a motion to vacate his plea because the court and counsel failed to advise him of the possibility that the State would file a petition for involuntary commitment under the Act.

¶ 33　The supreme court explained that, although collateral, "the potential consequence of involuntary commitment is no doubt uniquely severe," and that its practical effect "may be to

impose confinement for life." *Id.*, ¶ 51. Accordingly, the supreme court held that "defense counsel has a minimal duty to advise a defendant who pleads guilty to a triggering offense subject to the provision of the Sexually Violent Persons Commitment Act that he will be evaluated for and may risk involuntary commitment after completing his prison term." *Id.*, ¶ 60.

¶ 34    However, under the facts presented in *Hughes*, the supreme court found that the defendant had failed to establish that counsel performed deficiently. The record showed that defense counsel was "intimately familiar with the Act and the potential consequences for sexually violent offenders, having been in charge of the sexually violent persons division of the Attorney General's office." *Id.*, ¶ 61. Counsel also testified that he had received a report from his expert that defendant was not a sexually dangerous person, that he did not anticipate a sexually violent person petition being filed, and that he did not advise defendant of that possibility. *Id.* Moreover, at the hearing on defendant's motion to withdraw his plea, defendant answered "[y]es" when asked whether he had a conversation with counsel about a sexually violent person petition. Based on the record, the supreme court found that the defendant "was less than clear as to whether he had discussed the possibility of a sexually violent person petition with counsel and the extent of that conversation and his knowledge prior to the plea." Accordingly, the supreme court determined that the defendant had not met his burden of showing that his plea was not knowing due to counsel's deficiency. *Id.*, ¶ 62.

¶ 35    Additionally, the supreme court in *Hughes* determined that the defendant did not articulate any prejudice "beyond stating that had he known of the possibility for civil commitment he would not have pled guilty because he thought that it would resolve the matter." *Id.* ¶ 66. "Without more

than this mere assertion, defendant has not met his burden to establish the necessary showing under *Strickland* to merit a withdrawal of his plea in this case." *Id*.

¶ 36 By contrast, in this case, there is no ambiguity in the record as to whether defendant was misadvised or whether counsel performed deficiently. And defendant's allegations here amount to more than mere assertions that he would not have pled guilty absent counsel's deficiency. Defendant testified that he accepted the State's plea offer because he believed that, if he did so, he would be released the following day. The record shows that he rejected an offer for 6 years' imprisonment before accepting an offer for 5.5 years' imprisonment, further evidencing that he was focused on immediate release. His sister Nina also testified that plea counsel told her that defendant would be quickly released to her. Thus, it is clear that defendant believed, based on the erroneous advice of counsel, that pleading guilty would result in his release from custody. In these circumstances, the record supports defendant's claim that he would not have pleaded guilty if not for counsel's deficiency.

¶ 37 The State contends that defendant's claims amount to no more than bare allegations, because there "is no indication that defendant did suffer, or even was concerned he might suffer, from any mental disorder that could make him a sexually violent person under the Act, and thus support a great concern about being screened pursuant to the Act." The State's assertion, however, is disingenuous as the record contains a petition filed by the State to commit defendant as a sexually dangerous person, in which the State asserts that he suffers from "Pedophilic Disorder, sexually attracted to both, non-exclusive type, and Antisocial Personality Disorder." Although we do not have the benefit of a psychological report, as it was not included in the record on appeal, the petition indicates that a report exists.

¶ 38   The State also contends that defendant has not shown it would have been rational for him to reject the plea offer. When a defendant claims his counsel's ineffectiveness affected his understanding of the consequences of pleading guilty, he need not show that he had a viable defense or would have been acquitted following trial. *People v. Brown*, 2017 IL 121681, ¶¶ 34-35 (citing *Lee v. United States*, 582 U.S. 357, 364-65 (2017)). Rather, comparing the consequences of a conviction following trial to the consequences of entering the plea, the defendant must show that it would have been rational for him to opt for a trial. *Id.* ¶¶ 35-36.

¶ 39   The State points out that, if defendant had been convicted at trial, he faced a lengthy term of imprisonment which would also be followed by the possibility of civil commitment under the Act. The State stresses that defendant's guilty plea only created a possibility, not a certainty, that he would be committed. Thus, according to the State, it would have been irrational for defendant to reject the State's plea offer. We disagree.

¶ 40   Defendant was charged with two counts of predatory criminal sexual assault of a child, a Class X felony; two counts of aggravated criminal sexual abuse, a Class 2 felony; and three count of aggravated kidnapping, a Class X felony. His sentences for predatory criminal sexual assault, which were based on different acts, would have to be served consecutively to any other prison term. 730 ILCS 5/5-8-4(d)(2) (West 2014). Assuming the aggravated kidnapping counts merged into one, and the aggravated criminal sexual abuse counts merged into the predatory criminal sexual assault counts, the minimum sentence was therefore 18 years' imprisonment, to be served at 85%. 730 ILCS 5/5-4.5-25(a) (West 2014) (Class X sentencing minimum is 6 years); 730 ILCS 5/5-4.5-35(a) (West 2014) (Class 2 sentencing minimum is 3 years); 730 ILCS 5/3-6-3(a)(2)(ii)

(West 2014) (sentences for predatory criminal sexual assault and aggravated kidnapping must be served at 85%).

¶ 41    As to the maximum potential sentence if convicted on all counts, defendant correctly notes that the maximum sentence on the two PCSA counts alone was 120 years' imprisonment. 720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2014). If the court found that he committed all of the offenses within a single course of conduct that would be the maximum possible sentence. 730 ILCS 5/5-8-4(f)(2) (West 2014) (maximum aggregate consecutive prison term for offenses committed within single course of conduct is maximum sentence of the two most serious felonies). However, the indictment specifies that the offenses were committed during a span of months, the PCSA counts were based on separate acts, and the ACSA counts were based on separate acts different than those underlying the PCSA counts. It is not clear, therefore, that the offenses were committed within a single course of conduct. If the court found that defendant did not commit his offenses within a single course of conduct, there would be no limitation on the maximum aggregate consecutive prison term. *Id.* In any case, defendant faced a lengthy prison term if convicted after trial with a maximum sentence of at least 120 years.

¶ 42    Accordingly, defendant faced a decision. If he chose to go to trial, defendant could be acquitted and therefore released, or found guilty and sentenced to 18 to 120 years' imprisonment, or more, 85% of which he would have to serve. Upon completing his term of imprisonment, defendant would be evaluated under the Act and either be released or subject to proceedings that could result in an indeterminate term of civil commitment with a yearly chance at release. If defendant chose to plead guilty, he would be sentenced to the plea offer of 5.5 years' imprisonment, time already served. Thereafter, defendant would be evaluated under the Act and,

again, be released or subjected to proceedings that could result in an indeterminate term of civil commitment with a yearly chance at conditional release or discharge.

¶ 43    We recognize the distinction between criminal imprisonment and civil commitment under the Act; in particular, the Act allows a person to file yearly petitions for conditional release or discharge. We further recognize that, as the trial court noted, had defendant been found guilty after a trial and served a lengthy sentence of imprisonment, he could find himself exactly where he was when he pled guilty: subject to screening and potential commitment under the Act. And, as the State notes, at the time defendant pled guilty, his commitment was merely a possibility, not a certainty. *Cf. People v. Pagsisihan*, 2020 IL App (1st) 181017, ¶¶ 3, 46 (citing *Lee*, 582 U.S. at 371) ("the United States Supreme Court said forgoing a guilty plea is rational (or at least not irrational) when it means the difference between *certain* deportation and *almost certain* deportation") (emphasis in original).

¶ 44    We also acknowledge that, as the State notes, defendant's commitment was not an absolute certainty. Rather, a person is only committed under the Act if the State or Attorney General petitions for his commitment and proves at a trial, beyond a reasonable doubt, that he is a sexually violent person. See *Hughes*, 2012 IL 112817, ¶¶ 37-40 (outlining the Act's procedures). However, the likelihood of defendant's commitment was not insignificant after the instant guilty plea to ACSA, particularly considering his prior history which included a juvenile adjudication for ACSA. See 725 ILCS 207/5 (" 'Sexually violent person'  means a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, *** and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence."). Nevertheless, the fact remains

that the State did petition for defendant's commitment under the Act, and on appeal, defendant confirms that he is in the custody of DHS, and remains committed under the Act. The Illinois Department of Corrections website confirms that defendant is in custody; he was admitted to the Department of Corrections on October 5, 2018, and was "release[d] to DHS supervision" on November 1, 2018, with a projected discharge date "to be determined."[2] Accordingly, defendant has now spent almost 5½ years in custody, subsequent to a guilty plea for which he believed he had served his time and would be released.

¶ 45    Having been uninformed about the Act's procedures when he pled guilty, defendant was operating under a misapprehension of the facts and law and believed he *would*, not *could*, be quickly released if he pled guilty. See *Hughes*, 2012 IL 112817, ¶ 32. The State's argument that defendant would face the same possibility of indefinite commitment following a sentence imposed after trial as he did following a guilty plea cuts both ways. As noted above, it may be rational to take " 'even the smallest chance' " of acquittal at trial when, from the defendant's perspective, the consequences are " 'similarly dire' " to pleading guilty. *Id.* ¶ 36 (quoting *Lee*, 582 U.S. at 367). From the perspective of a defendant who would have to face the consequences of the choice, it is unclear that a conviction following trial would result in a markedly harsher consequence. This is especially true where defendant has established that the primary factor driving his decision to accept the plea offer was his belief that doing so would provide his immediate release.

---

[2] This court may take judicial notice of information appearing on the IDOC website. *People v. Peacock*, 2022 IL App (1st) 170308-B, citing *People v. Ware*, 2014 IL App (1st) 120485, ¶ 29.

¶ 46 Rather, had defendant known of the possibility for commitment under the Act, pleading guilty and being found guilty at trial would both have appeared to risk an indefinite restraint on his liberty. See *Brown*, 2017 IL 121681, ¶ 36 (evaluating rationality from the defendant's perspective); *Hughes*, 2012 IL 112817, ¶¶ 51-52 (civil commitment is a "uniquely severe" potential consequence and may result in "confinement for life," and be "more severe than the criminal penalty imposed by the court" (internal quotation marks omitted)). One option offered a chance at release contingent on proceedings under the Act. The other, however, offered a chance at release unencumbered by the Act. See 725 ILCS 207/15 (West 2018) (a petition filed under the Act must allege, among other things, that the person "has been convicted," "found delinquent," or "found not guilty by reason of insanity, mental disease or defect," of a sexually violent offense"). That option was going to trial, where, however unlikely, he could be acquitted. The fact that defendant has not offered a viable defense or claim of innocence is only minimally probative here where his claim is based on a misunderstanding of the consequences of his plea. See *People v. Jones*, 2021 IL App (1st) 182392, ¶ 69 (existence of defense or claim of innocence is relevant when considering consequences of pleading guilty but "not a requirement, particularly if there are other relevant consequences" of pleading guilty). Given the options defendant faced, we understand how "even the smallest chance of success at trial may look attractive." *Lee*, 582 U.S. at 358.

¶ 47 Undoubtedly, some people in defendant's position would choose to accept the State's plea offer as it did not carry a term of imprisonment and, even if committed under the Act, there would be a yearly chance for conditional release or discharge. That does not mean, however, that it would be irrational for any defendant to reject the offer. *Lee*, 582 U.S. at 371 ("Not everyone in

[defendant's] position would make the choice to reject the plea. But we cannot say it would be irrational to do so."). Here, where defendant's counsel affirmatively misinformed him that pleading guilty would result in his release, we conclude his guilty plea was entered under a misapprehension of the law and facts, and he should be permitted to withdraw it.

¶ 48    In so holding, we note that, although defendant was not admonished by the court or the State's Attorney of the possibility of indefinite commitment, we do not fault the court or State's Attorney. The blame rests solely on plea counsel, whose deficient performance has led to significant delays in the pursuit of justice in this case. As pointed out above, defendant has been held in DHS custody for over 5 ½ years, and it is only now that this court is vacating his plea of guilty. It is not the obligation of the court or the State's Attorney to ensure that the defendant is properly advised of the collateral consequences of his plea. *Hughes*, 2012 IL 112817, ¶ 40. Nonetheless, this case illustrates that it might be prudent for the court to consider advising any defendant subject to the Act of the possibility of lifetime commitment.

¶ 49    In short, plea counsel performed deficiently by failing to advise defendant that if he pled guilty he could be involuntarily committed under the Act. By entering his plea without that knowledge and while believing the plea would result in his near-immediate release, defendant was operating under a misapprehension of the facts and law. As pleading guilty subjected him to a process that could result in indefinite, involuntary commitment, it would have been rational to reject the offer and hope for an acquittal at trial. Accordingly, we reverse the decision of the trial court denying him leave to withdraw his plea and remand for further proceedings. See *Delvillar*, 235 Ill. 2d at 519-20.

¶ 50    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County.

¶ 51    Reversed and remanded.